## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVE KLEIN, Individually and On Behalf Of All Others Similarly Situated,<br><br>         Plaintiff,<br><br>  vs.<br><br>PXRE GROUP LTD., JEFFREY L. RADKE, and JOHN M. MODIN,<br><br>         Defendants. | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED**<br><br>"ECF CASE" No. 06 CV 3440<br><br>      (SWK) |

Plaintiff, Steve Klein ("Plaintiff"), upon the investigation of Plaintiff=s counsel, which included, among other things, a review of the defendants= public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PXRE Group Ltd. ("PXRE" or the "Company"), securities analysts reports and advisories about the Company, and information readily available on the Internet.

### NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the publicly traded securities of PXRE between July 28, 2005 and February 16, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      PXRE provides catastrophe reinsurance products and services to both primary insurers and reinsurers. Since 1987, PXRE has specialized in offering catastrophe and risk excess reinsurance.

3.      The Complaint alleges that defendants' issued a series of false and misleading statements to the market which artificially inflated the Company's stock.   Particularly, the Defendants failed to disclose the following materially adverse facts to the market: (1) that the Company concealed from investors the full impact on its business of hurricanes Katrina, Rita, and Wilma ("2005 Hurricanes"); (2) that, in fact, the Company's cost of the 2005 Hurricanes had doubled to an estimated $758 million to $788 million; (3) that the magnitude of the loss would cause the Company to lose crucial financial-strength and credit ratings from A.M. Best, an influential industry-rating agency (3) that the Company concealed the losses in order to complete a $114 million secondary offering and raise more than $350 million from an offering of perpetual preferred shares; and (4) that as a consequence of the foregoing, the Company's statements with respect to its loss estimates for the 2005 Hurricane season lacked in all reasonable basis.

4.      On February 16, 2006, after the close of the market, PXRE shocked investors when it announced that it would be increasing its estimates of the net pre-tax impact of Hurricanes Katrina, Rita and Wilma by an amount between $281 million to $311 million for the year ended December 31, 2005 compared to the high end of their prior announced estimates.

5.      Later that same day, February 16, 2006, A.M. Best announced that it had downgraded the financial strength rating of PXRE to B++ (Very Good) from A- (Excellent).

6.      News of this caused shared of PXRE to plummet on February 17, 2006. By the end of the day, shares of PXRE had fallen $7.85 per share, or 65.94 percent, on high trading volume, to close at $4.05 per share

### JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.1 0b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

9. Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. 1391(b) and (c). Many of the acts and transactions alleged herein occurred in substantial part in this Judicial District. Pursuant to 28 U.S.C. § 1391(d), as an alien corporation, PXRE may properly be sued in any District in the United States, including the Southern District of New York. Moreover, PXRE trades its shares on the New York Stock Exchange (the "NYSE") which is located in the Southern District of New York. Thus, venue is proper in this District.

10. In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national Securities exchange.

## PARTIES

11. Plaintiff, Steve Klein, as set forth in the accompanying certification, incorporated by reference herein, purchased PXRE Securities at artificially inflated prices during the Class Period and has been damaged thereby.

12. Defendant PXRE is a Bermuda corporation that maintains its principal place of business at PXRE House, 110 Pitts Bay Road, Pembroke HM 08 Bermuda.

13. Defendant Jeffrey L. Radke ("Radke") was, at all relevant times, the Company's President and Chief Executive Officer.

14. Defendant John M. Modin ("Modin") was, until his resignation on January 6, 2006, the Company's Executive Vice President and Chief Financial Officer.

15. Defendants Radke and Modin are collectively referred to herein as the "Individual

- 3 -

Defendants." The Individual Defendants, because of their positions within the Company, had the power and authority to control the contents of PXRE's quarterly reports, press releases and presentations to Securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of PXRE between July 28, 2005 and February 16, 2006, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PXRE's securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to

- 4 -

Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PXRE or its transfer agent and may be notified of the pendancy of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (1) whether the federal securities laws were violated by defendants' acts as alleged herein; (2) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of PXRE; and (3) to what extent the members of the Class have sustained damages and the proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

22.    PXRE is an insurance holding company that provides reinsurance products and services worldwide. It primarily offers property catastrophe reinsurance and retrocessional coverage.

### Materially False and Misleading
### Statements Issued During the Class Period

23.    On July 28, 2005, PXRE announced results for the second quarter ended June 30, 2005. Specifically, the Company stated that net operating income per diluted share was $1.27 compared to $1.21 in the second quarter of 2004, and net income was $43.5 million, or $1.30 per diluted share, compared to $32.3 million, or $1.20 per diluted share, in the second quarter of 2004.

Commenting on these results, defendant Radke stated:

"We continue to successfully execute our strategy, as evidenced by net income of $43.5 million achieved during the quarter, the highest quarterly net income in PXRE's history. Against the backdrop of a challenging property reinsurance environment, our strong market position with our focus on retrocessional business has allowed PXRE to take advantage of opportunities available in certain segments of the market. We remain on track to achieve our previously announced goal of 10% cat and risk excess earned premium growth in 2005."

With respect to losses from a busy 2005 hurricane season and its effect on the Company's financial future, defendant Radke stated:

**"We do not expect to experience significant losses from the hurricanes that occurred in July 2005.** Our loss estimates are preliminary, however, as history has proven that it is difficult to accurately estimate losses in the immediate aftermath of a catastrophe. Assuming our preliminary estimates are accurate, we continue to expect to achieve earnings of $4.50 to $5.00 per diluted share for 2005 if no major catastrophes occur during the rest of 2005." (Emphasis added.)

- 6 -

24.      On July 29, 2005, PXRE filed its quarterly report with the SEC on Form 10-Q. The

Company's Form 10-Q was signed by defendant Modin and reaffirmed the Company's previously

announced financial results of July 28, 2005. With respect to how the Company estimates loss and

loss expense, PXRE stated:

> As a property catastrophe reinsurer, incurred losses are inherently more volatile than those of primary insurers and reinsurers of risks that have an established historical pattern of losses. In addition, with respect to insured events that occur near the end of a reporting period, as well as with respect to our retrocessional book of business, the significant delay in losses being reported to insurance carriers, reinsurers and finally retrocessionaires requires us to make estimates of losses based on limited information from our clients, industry loss estimates and our own underwriting data. Because of the uncertainty in the process of estimating our losses from insured events, there is a risk that our liabilities for losses and loss expenses could prove to be inadequate, with a consequent adverse impact on our future earnings and shareholders' equity.
>
> In reserving for catastrophe losses, our estimates are influenced by underwriting information provided by our clients, industry catastrophe models and our internal analyses of this information. This reserving approach can cause significant development for an accident year when events occur late in the period. As an event matures, we rely more and more on our development patterns by type of event as well as contract information to project ultimate losses for the event. This process can cause our ultimate estimates to differ significantly from initial projections. The French storm Martin that occurred on December 27, 1999 presents an example of these potential uncertainties. Initially we based our reserves to a significant degree on industry estimates of the total loss, which were approximately $1.0 billion. In 2001, the cost was estimated to be $2.5 billion by SIGMA, a widely used industry publication. Our gross loss estimate at December 31, 1999 for this event was $31.3 million. Our gross loss estimate at June 30, 2005 for this event was $65.5 million. Thus, the original industry loss estimate increased by 150%, and our loss estimate has increased by 109%.
>
> A number of significant catastrophe losses occurred in the second half of 2004, including hurricanes Charley, Frances, Ivan and Jeanne, the Asian Tsunami, and Typhoon Songda. Our reserve estimates are primarily based on reported losses, modeling, a detailed review of affected contracts and numerous discussions with our clients. The ultimate impact of losses from these 2004 events

might therefore differ substantially from either our current aggregate loss estimates or our individual estimates for each event.

In reserving for non-catastrophe losses from recent periods, we are required to make assumptions concerning the expected loss ratio usually for broad lines of business, but sometimes on an individual contract basis. We consider historical loss ratios for each line of business and utilize information provided by our clients and estimates provided by underwriters and actuaries concerning the impact of pricing and coverage changes. As experience emerges, we will revise our prior estimates concerning pricing adequacy and non-catastrophe loss potential for our coverages and we will eventually rely solely on our indicated loss development patterns to estimate ultimate losses.

In addition, the risk for recent underwriting years includes the increased casualty exposures assumed by us through our casualty and finite businesses. Unlike property losses that tend to be reported more promptly and usually are settled within a shorter time period, casualty losses are frequently slower to be reported and may be determined only through the lengthy, unpredictable process of litigation. Moreover, given our limited experience in the casualty and finite businesses, we do not have established historical loss development patterns that can be used to establish these loss liabilities. We must therefore rely on the inherently less reliable historical loss development patterns reported by our clients and industry loss development data in calculating our liabilities. PXRE's loss reserve estimation process takes into consideration the facts and circumstances related to reported losses; however, for immature accident years, reported casualty losses are relatively insignificant when compared to ultimate losses. As such, it is difficult to determine how facts and circumstances related to early-notified claims will impact future reported losses. When reported losses grow to a magnitude at which they suggest a trend, PXRE can, and does, re-estimate loss reserves.

PXRE has historically been involved in very few disputes with ceding companies, especially those that enter into contracts that the Company includes in its catastrophe and risk excess segment; nevertheless contract disputes in the property casualty reinsurance industry have increased in recent years.

There is an additional risk of uncertainty in PXRE's estimation of loss due to the fact that PXRE writes only reinsurance business and no insurance business. As a result, losses, unearned premiums and premiums written are all recorded based on reports received from the ceding companies. PXRE does not receive loss information from the underlying insureds; however, since the Company's reinsurance business focuses on short-tail lines such as property catastrophe,

- 8 -

retrocessional property catastrophe, risk-excess and aerospace, the delay from the time of the underlying loss to the report date to PXRE is not as significant a risk as it would be if the Company underwrote a significant amount of casualty business; however, with respect to insured events that occur near the end of a reporting period, as well as with respect to our retrocessional book of business, a delay in losses being reported to insurance carriers, reinsurers and finally retrocessionaires may require us to make estimates of losses based on limited information from our clients, industry loss estimates and our own underwriting data.

PXRE derives almost all of its business from reinsurance intermediaries. As a result, the ceding company reports claims to the intermediary and the intermediary in turn reports the data to all the reinsurers included in the underlying program. Controls in place require that certain claims must be approved by the underwriter or a member of senior management. The underwriter, based on his knowledge and judgment, may question the broker or ceding company if he did not expect a loss of a certain magnitude to impact a certain layer. Since many of PXRE's losses are from events that are well known, such as large hurricanes and earthquakes, the underwriter may in fact expect losses to certain layers and therefore would not question the accuracy of such loss reports. If the underwriter does question the loss data, PXRE may perform audits at the underlying ceding company in order to determine the accuracy of the amounts ceded. PXRE's risk management and underwriting systems provide a list of impacted or potentially impacted contracts by peril and by geographic zone. This assists PXRE in determining the completeness of losses, as it will contact intermediaries and the ceding companies for which it believes underlying contracts are impacted subsequent to an event to request information.

Currently, PXRE does not have any backlog related to the processing of assumed reinsurance information. When a large loss occurs, the Company shifts personnel from various functions to assist the claims personnel in the processing and evaluation of claims data.

Finally, PXRE records reserves for losses that have been incurred but not yet reported, which are generally referred to as IBNR reserves. The IBNR includes both losses from events which PXRE is not aware of and losses from events which PXRE is aware of but has not yet received reports from ceding companies.

During the second quarter of 2005, we experienced net adverse development of $11.9 million for prior-year losses and loss expenses, consisting of $10.5 million of adverse development on our catastrophe and risk excess segment and $1.4 million of adverse development on our exited lines segment. The $10.5 million of

prior-year catastrophe and risk excess losses were related to re-estimation of the 2004 storms following additional reports from cedents. Prior year losses in the exited lines segment were related to three large direct treaty claims reported during the quarter. During the second quarter of 2004, we experienced net unfavorable development of $1.7 million for prior-year loss and loss expenses due primarily to $2.6 million of unfavorable development on a 1999 catastrophe event after a cedent lost a court case contesting a claim.

25.    On September 11, 2005, PXRE announced that its preliminary estimate of its net loss from Hurricane Katrina was approximately $235 million, after tax, reinsurance recoveries on its outwards reinsurance program and the impact of inwards and outwards reinstatement and additional premiums. Based on this estimate, the Company was expected to report a net loss of $85 to $100 million for 2005, assuming no additional material catastrophes occurred during the rest of 2005.

Commenting on these developments, defendant Radke stated:

"Our thoughts go out to those families who have been so devastated by the impact of Hurricane Katrina. While the storm appears likely to be the most costly insured loss in history, PXRE has repeatedly demonstrated the strength of our risk management and our dedication to prompt payment of claims to our customers through numerous prior catastrophes since 1983. The strong market position we have earned through our dedication to customer service, proven risk management ability and claims paying record has allowed PXRE to thrive in the wake of prior catastrophes. **We expect that the unprecedented industry losses arising from Hurricane Katrina, following on the 2004 hurricane losses, are likely to have a significant impact on reinsurance pricing, especially in our key retrocessional reinsurance business, and we believe that we are well positioned to take advantage of the opportunities that are likely to present themselves in the wake of Hurricane Katrina.** Moreover, management and our Board of Directors are currently considering a capital raising plan that will allow PXRE to leverage those opportunities." (Emphasis added.)

26.    On September 19, 2005, PXRE announced an update on its initial preliminary loss estimates for Hurricane Katrina. Based on insured industry losses of $30 to $40 billion, PXRE estimated that its net impact from Hurricane Katrina would be in the range of $235 to $300

million, after tax, reinsurance recoveries on its outwards reinsurance program and the impact of

inwards and outwards reinstatement and additional premiums. Based on this updated preliminary

estimate, the Company was expected to report a net loss of $85 to $165 million for 2005, assuming

no additional material catastrophes occur during the rest of 2005. Commenting on this, defendant

Radke stated:

> "Since we announced our initial loss estimates, our retrocessional underwriters were able to meet with a number of our retrocessional cedents during the Monte Carlo Rendezvous industry conference and our North American underwriters have continued to have discussions and meet with our North American property catastrophe and risk excess cedents. We have also continued our internal modeling work and have analyzed the further output by third party modeling firms. As result of these continuing efforts and the significant uncertainties surrounding the impact of Hurricane Katrina, PXRE now believes that it is prudent to expand our range of reasonably likely insured industry losses to a range of $30 to $40 billion, which represents an increase in the upper end of our prior $30 to $35 billion industry loss range.

> …The Monte Carlo Rendezvous also provided us with significant feedback on Katrina's likely impact on reinsurance markets. Based on our market discussions, we now expect to see substantial increases in rates and limitations in coverage for each of the lines of business we write. We expect the scope of these changes to be at least as pronounced in our lines of business as those experienced after other market-changing events such as the World Trade Center disaster in 2001 and Hurricane Andrew in 1992."

27.    On September 28, 2005, PXRE announced that its preliminary estimate of the net

impact from Hurricane Rita was between $30 million and $40 million, after tax, reinsurance

recoveries on its outwards reinsurance program and the impact of reinstatement premiums. Based

on the Company's preliminary estimate of loss from Hurricane Rita and its previously announced

preliminary range of loss from Hurricane Katrina, the Company was expected to report a net loss

of $125 to $220 million for 2005, assuming no additional material catastrophes occur during the

rest of 2005. For the quarter ending September 30, 2005, PXRE expected to report a net loss of

between $230 to $320 million which was expected to result in a diluted book value range of approximately $13.10 to $15.75 per share as of September 30, 2005.

28.    On September 30, 2005, PXRE issued three press releases. In the first press release, PXRE announced that it intended to make a public offering of approximately $100 million of its common shares. PXRE expected to contribute the net proceeds of the offering to PXRE Reinsurance Ltd., its Bermuda reinsurance subsidiary, to support the underwriting of reinsurance business during the January 1, 2006 renewal period and throughout the balance of 2006.

29.    Also on September 30, 2005, PXRE announced that it had agreed to sell 375,000 of its series D perpetual preferred shares in a private placement pursuant to Section 4(2) of the Securities Act of 1933. The series D perpetual preferred shares had an initial liquidation preference, subject to adjustment, of $1,000 and an $11.00 per common share exchange price. At the initial liquidation price, the Company would raise $375 million ($360.5 million of proceeds net of agents' fees) in the private placement and, at the exchange price of $11.00 per common share, each series D perpetual preferred share will be mandatorily exchangeable for approximately 90.9 of the Company's common shares immediately upon an affirmative vote of the Company's shareholders (i) authorizing an additional 300 million common shares; and (ii) approving the exchange of the series D perpetual preferred shares into common shares.

30.    In the last press release of September 30, 2005, PXRE provided the following comment on recent decisions by Standard & Poor's and A.M. Best Co ("A.M. Best"). to downgrade certain ratings on the Company and its subsidiaries, including Standard & Poor's lowering its counterparty credit and financial strength ratings on PXRE from "A" (Strong) to "A-" (Strong) and A.M. Best lowering is financial strength rating from "A" (Excellent) to "A-" (Excellent).  Defendant Radke commented on this, stating:

"We are disappointed with the rating agency decisions. **The strong market position we have earned through our dedication to customer service and strong claims paying record over the past 23 years gives us confidence in our ability to thrive in the wake of Hurricanes Katrina and Rita and recent feedback** from communications with brokers validates that confidence. We remain committed to the focused strategy that is the core of our franchise, superior historical operating performance and proven record of prompt and certain claims payments.

We have also taken steps that will further improve our financial position and allow us to benefit from favorable market conditions following Katrina and Rita. Specifically, we are executing a capital raising plan, the first step of which was announced yesterday concerning our agreement to sell approximately $375 million in perpetual preferred shares that will be mandatorily exchanged for common shares upon shareholder approval. We have also announced our intention to make a public offering of approximately $100 million of our common shares, which will be offered by the Company and sold under the Company's registration statement on Form S-3 that has been declared effective by the Securities and Exchange Commission. Upon completion of our capital raising plan, we expect to enter the key January 1, 2006 renewal period with our strongest balance sheet ever. (Emphasis added.)

On October 7, 2005, PXRE announced that it had completed the public offering of 8,843,500 of its common shares to Credit Suisse First Boston LLC, at a public offering price of $13.25 per share. Net proceeds to the Company from the common stock offering, after deducting estimated expenses, would be approximately $114.7 million.

30.     Also on October 7, 2005, PXRE announced that it had completed the sale of 375,000 of its series D perpetual preferred shares in a private placement pursuant to Section 4(2) of the Securities Act of 1933. The gross proceeds from the private placement were $375 million, and proceeds net of agents' fees and offering expenses were $359.3 million.

31.     On October 27, 2005, PXRE announced results for the third quarter ended September 30, 2005, which included the impact of Hurricanes Katrina and Rita. According to the Company, net operating loss per adjusted diluted share was $9.46 compared to a net operating loss

per adjusted diluted share of $2.67 in the third quarter of 2004; and net loss was $317.3 million compared to a net loss of $73.2 million in the third quarter of 2004. Additionally, the Company reported: "[g]iven the current uncertainty of the net impact of Hurricane Wilma on the Company's fourth quarter results, PXRE ha[d] withdrawn its previously disclosed guidance for the year and [would] not be providing revised guidance for 2005 at this time."

Commenting on these results, defendant Radke stated:

"Hurricanes Katrina and Rita will make the third quarter of 2005 the most costly quarter in history for the reinsurance industry in terms of insured catastrophe loss. PXRE's loss for the quarter is correspondingly large but the storms again demonstrated the strength of PXRE's risk management, as our losses were within our expectations for such major events.

. . . The strategic market position we have earned over the past 23 years through our dedication to customer service and prompt claims payment gives us confidence in our ability to thrive in the wake of Hurricanes Katrina and Rita, and recent feedback from communications with brokers validates that confidence. Indeed, our recent success in raising $474 million of equity capital reflects investors' belief in the strength of PXRE's franchise, which flows from our focused strategy and proven risk management.

Following our successful capital raising efforts, PXRE now has $914 million of pro-forma shareholders' equity and approximately $1.1 billion of pro-forma capital as of September 30, 2005, which represent the highest levels in our history. Our increased size positions us well to take advantage of both the expected substantial increases in rates and improved terms and conditions for each of the lines of business we write. We expect the scope of these changes to be at least as pronounced in our lines of business as those experienced after other market-changing events such as the World Trade Center disaster in 2001 and Hurricane Andrew in 1992."

32.    On October 28, 2005, PXRE filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Modin and reaffirmed the Company's previously announced financial results of October 27, 2005. Moreover, the Company made the same representations with respect to how the Company estimates loss and loss expense.

33.    On November 9, 2005, PXRE announced that its preliminary estimate of the net impact from Hurricane Wilma was between $75 million and $90 million, net of reinsurance, reinstatement premiums and tax. The Company's loss estimate assumed that the insured industry losses caused by Hurricane Wilma in Mexico and the United States would be approximately $14.5 billion.

34.    The statements set forth in ¶¶ 17-27, 30-33 above were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company concealed from investors the full impact on its business of hurricanes Katrina, Rita, and Wilma; (2) that, in fact, the Company's cost of the 2005 Hurricanes had doubled to an estimated $758 million to $788 million; (3) that the magnitude of the loss would cause the Company to lose key financial-strength and credit ratings from A.M. Best, an influential industry-rating agency (3) that the Company concealed the losses in order to complete a $114 million secondary offering and raise more than $350 million from an offering of perpetual preferred shares; and (4) that as a consequence of the foregoing, the Company's statements with respect to its loss estimates for the 2005 Hurricane season were hopelessly inaccurate.

### The Truth Emerges

35.    On February 16, 2006, after the close of the market, PXRE shocked investors when it announced that it would be increasing its estimates of the net pre-tax impact of Hurricanes Katrina, Rita and Wilma by an amount between $281 million to $311 million for the year ended December 31, 2005 compared to the high end of its prior

announced estimates. Previously, the Company had estimated that the net pre-tax impact of these 2005 Hurricanes would be $462 million to $477 million, reflecting a net pre-tax impact of $383 million for Hurricanes Katrina and Rita and a net pre-tax impact of between $79 million to $94 million for Hurricane Wilma ($75 million to $90 million after tax). Additionally, the Company stated that it had been notified that these developments would likely have a negative impact on the Company's current "A-" financial strength ratings. In light of the potential negative impact that adverse rating actions would have on the Company's future business, PXRE had decided to explore strategic alternatives for the Company and it has retained Lazard as a financial advisor to assist it in this process.

Commenting on this, defendant Radke stated:

"Our fourth quarter results will reflect the severe losses associated with Hurricane Wilma, as well as significant development on Hurricanes Katrina and Rita. The scope of these storms, our clients' difficulty in estimating and adjusting their claims, particularly those in our Retrocessional and Direct & Facultative business lines, together with the combination of wind and flood damage from Hurricane Katrina, dramatically increased the challenge of accurately estimating losses immediately following the events.

. . . PXRE has taken steps that substantially improve our risk profile, including increased reinsurance coverage, reducing our peak zone exposure and reducing our exposure to certain large events and second events through catastrophe bond transactions. In light of these steps and our strong track record, we are disappointed by the expected rating agency action. Although the agencies have acknowledged that we have dramatically reduced the risk in our portfolio, they are of the view that our book of business may be too volatile for a rating in the 'A' range."

36.    Later that same day, February 16, 2006, A.M. Best announced that it had downgraded the financial strength rating of PXRE to B++ (Very Good) from A- (Excellent). According to A.M. Best, the downgrades followed PXRE's announcement that it increased its net loss estimates for hurricanes Katrina, Rita and Wilma.

37.    News of this sent shares of PXRE spiraling downward on February 17, 2006. By the end of the day, shares of PXRE had fallen $7.85 per share, or 65.94 percent, on high trading volume, to close at $4.05 per share.

38.    On April 11, 2006, PXRE announced that it had requested that the major credit rating agencies withdraw their financial strength and claims paying ratings of the Company and its operating subsidiaries. Commenting on the news, defendant Radke stated:

> After much consideration, we have asked the major rating agencies to withdraw their financial strength and claims paying ratings for PXRE. In the period since the downgrades, we have found that operational ratings below the critical 'A' category provide little value for a reinsurer."

## LOSS CAUSATION

39.    The market for PXRE's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, PXRE's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired PXRE's securities relying upon the integrity of the market price of PXRE's securities and market information relating to PXRE, and have been damaged thereby.

40.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of PXRE's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

- 17 -

41.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about PXRE's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of PXRE and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

42.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

43.     During the Class Period, Plaintiff and the Class purchased securities of PXRE at artificially inflated prices and were damaged thereby. The price of PXRE publicly traded securities declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## ADDITIONAL SCIENTER ALLEGATIONS

44.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in

the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding PXRE, their control over, and/or receipt and/or modification of PXRE allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning PXRE, participated in the fraudulent scheme alleged herein.

45.    During the Class Period, and with the Company's stock trading at artificially inflated prices, PXRE completed a public offering of 8,843,500 of its common shares to Credit Suisse First Boston LLC, at a public offering price of $13.25 per share for net proceeds of about $114.7 million. Also, PXRE completed the sale of 375,000 of its series D perpetual preferred shares in a private placement for gross proceeds of $375 million.

### Applicability of Presumption of Reliance:
### Fraud-On-The-Market Doctrine

46.    At all relevant times, the market for PXRE securities was an efficient market for the following reasons, among others:

a.    PXRE stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, PXRE filed periodic public reports with the SEC and the NYSE;

c.    PXRE regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    PXRE was followed by several securities analysts employed by major brokerage

- 19 -

firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

47.    As a result of the foregoing, the market for PXRE securities promptly digested current information regarding PXRE from all publicly-available sources and reflected such information in PXRE stock price. Under these circumstances, all purchasers of PXRE securities during the Class Period suffered similar injury through their purchase of PXRE securities at artificially inflated prices and a presumption of reliance applies.

## THE SAFE HARBOR PROVISION IS INAPPLICABLE

48.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of PXRE who knew that those statements were false when made.

## COUNT I
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

49.    Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

50.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase PXRE securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

51.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for PXRE securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

52.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of PXRE as specified herein.

53.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PXRE value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about PXRE and its business operations and future prospects in the light of

the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of PXRE securities during the Class Period.

54.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

55.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PXRE's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such

knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

56.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of PXRE securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of PXRE's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired PXRE securities during the Class Period at artificially high prices and were damaged thereby.

57.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that PXRE was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their PXRE securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

58.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

59.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of
### The Exchange Act against the Individual Defendants

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     The Individual Defendants acted as controlling persons of PXRE within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

63.     As set forth above, PXRE and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of

the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

a.       Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

b.       .Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.       Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; andSuch other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

**POMERANTZ HAUDEK
BLOCKGROSSMAN & GROSS LLP**


By:_____s/_____
             Marc I. Gross (MG-4256)
          Jeremy A. Lieberman (JL-6130)

          100 Park Avenue, 26th Floor
          New York, New York
          10017Telephone:  (212) 661-
          1100Facsimile:  (212) 661-8665

**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**
          Patrick V. Dahlstrom (PD-5328)
          One North La Salle Street, Suite 2225

- 25 -

- 26 -

Chicago, Illinois 60602
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

*Attorneys for Plaintiff*

- **26** -